**<u>Exhibit B</u>**

(Operating Agreement of 4274 Colby, LLC)

## OPERATING AGREEMENT

## OF

## 4274 COLBY, LLC

THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the _30_ day of May, 2015 (the "**Effective Date**"), by and among the parties designated on Schedule A attached hereto (each referred to individually as a "**Member**" and collectively as the "**Members**"). Unless otherwise indicated, each capitalized term used in this Agreement shall have the meaning ascribed to it in Article 1.

For and in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree as follows:

## ARTICLE 1

1.1    **DEFINITION.** The capitalized words and phrases used in this Agreement, unless the context clearly indicates otherwise, shall have the meanings set forth in this Agreement, in Exhibit 1 attached hereto and made a part hereof.

## ARTICLE 2
## ORGANIZATION

2.1    **FORMATION.** The Company has been organized as a Kentucky limited liability company under and pursuant to the Act. The rights and obligations of the Members shall be as set forth in the Act except as this Agreement expressly provides otherwise.

2.2    **NAME.** The name of the Company is "4274 Colby, LLC" and all Company business shall be conducted in that name or such other name as the Members may select from time to time and which is in compliance with all applicable laws.

2.3    **REGISTERED OFFICE AND REGISTERED AGENT AND PRINCIPAL OFFICE.** The registered agent and registered office of the Company required by the Act to be maintained in the Commonwealth of Kentucky shall be the initial registered agent and registered office designated in the Company's Articles of Organization. The Members, at their discretion, may designate another registered agent and registered office in the manner provided by law. The principal office of the Company shall be at 201 West Short Street, Lexington, Kentucky 40507 or such place as the Members may designate from time to time, and the Members shall maintain records there as required by the Act (and shall keep the street address of such principal office at the registered office of the Company in the Commonwealth of Kentucky).

2.4   **PURPOSES AND POWERS.**  The purposes of the Company are to:

(a)   To engage in any lawful business activity that may be conducted by a limited liability company under the laws of the Commonwealth of Kentucky and to engage in any and all activities related or incidental thereto.

(b)   Without in any way limiting any of the purposes or powers of the Company, it is hereby provided that the Company shall have power to do all things necessary or incidental to the conduct of such business or businesses, and to do any and all of the things that this Agreement sets forth as objectives, purposes, powers or otherwise to the same extent and as fully as natural persons might or could do, or act in any part of the world as principals, agents, trustees or otherwise, it being expressly intended that the foregoing enumeration of objectives, purposes and powers shall not be held to limit or restrict in any manner the general powers of the Company and the Members.

The Company shall possess and may exercise all the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

2.5   **FOREIGN QUALIFICATIONS.**  The Company shall qualify to engage in business in the Commonwealth of Kentucky and in such other jurisdictions in which it is required by the nature of its business or otherwise to qualify in order to comply with the laws of such jurisdictions or in which the Members may determine it advisable to cause the Company to be so qualified.

2.6   **TERM.**  The Company commenced its existence upon the filing of its Articles of Organization with the Kentucky Secretary of State and shall continue in existence until dissolved in accordance with Article 10.

2.7   **ENTITY DECLARATION.**  The Company shall not be a general partnership, a limited partnership or a joint venture, and no Member shall be considered a partner or joint venturer of or with any other Member, for any purposes other than for federal, state and local tax purposes, and this Operating Agreement shall not be construed otherwise.

ARTICLE 3
CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1   **INITIAL CONTRIBUTIONS.**  The Members shall make Capital Contributions to the Company in cash and property (with corresponding Net Agreed Values) in the amount set forth in attached and incorporated Schedule A.

3.2   **SUBSEQUENT CONTRIBUTIONS.**  No Interest Holder shall be obligated to make any Capital Contributions to the Company other than those set forth on Schedule A.  If the Members determine that additional capital is required to meet the needs of the Company, written notice to that effect shall be given to all Interest Holders.  Such notice shall describe the purposes for which the capital is needed and the amount of capital that is needed from each Interest Holder

(based upon their relative Sharing Ratios). Each of the Interest Holders shall be entitled, but not required, to make such requested capital contributions in accordance with its relative Sharing Ratio. If not all of the Interest Holders make the additional capital contributions they were entitled to make, then those Interest Holders who did make their entitled contributions shall be entitled to make additional capital contributions (in an aggregate amount equal to the contributions not made by the other Interest Holders) in accordance with their relative Sharing Ratios among themselves or in such other percentages as they shall unanimously agree.

3.3   **RETURN OF CAPITAL CONTRIBUTIONS.** Except as expressly provided herein, no Interest Holder shall be entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.

3.4   **LOANS AND LOAN GUARANTEES BY MEMBERS.**

(a)   Any Interest Holder may, but is not obligated to, loan to the Company such sums as the Members determine to be appropriate for the conduct of the Company's business. Interest Holders shall have an equal opportunity to participate in any such loan ratably in accordance with their respective Sharing Ratios. Any such loans shall be made upon such terms and for such maturities as the Members determine are commercially reasonable.

(b)   Any Interest Holder may, but is not obligated to, become a guarantor of a loan to the Company. Interest Holders shall have an equal opportunity to participate in any such loan guarantees in accordance with their respective Sharing Ratios. Any such guarantees shall be made upon such terms as the Members determine are commercially reasonable.

3.5   **CAPITAL ACCOUNTS.** A separate Capital Account shall be maintained for each Interest Holder in accordance with the provisions of this Agreement and Treas. Reg. §1.704-1(b)(2)(iv). To the extent of any conflict between the provisions of this Agreement relating to the maintenance of Capital Accounts and the provisions of Treas. Reg. §1.704-1(b)(2)(iv), the provisions of Treas. Reg. §1.704-1(b)(2)(iv) shall control. Subject to the requirements of Treas. Reg. §1.704-1(b)(2)(iv), each Capital Account shall initially be credited with the initial Capital Contribution of the Interest Holder and thereafter shall be increased by (i) any cash and the fair market value of any property contributed by such Interest Holder (net of any liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code § 752) and (ii) the amount of all net income (whether or not exempt from tax) and gain allocated to such Interest Holder hereunder and decreased by (i) the amount of all Losses allocated to such Interest Holder hereunder (including expenditures described in Code § 705 (a)(2)(B) or treated as such an expenditure by reason of Treas. Reg. § 1.704-1 (b)(2)(iv)(i)) and (ii) the amount of cash and fair market value of property (net of any liabilities secured by such property that the Interest Holder is considered to assume or take subject to under Code § 752) distributed to such Interest Holder pursuant to Sections 4.6 and 10.3. If the Company has made an election under Code § 754, Capital Accounts shall also be adjusted to the extent required by Treas. Reg. § 1.704-1 (b)(2)(iv)(m).

3.6   CAPITAL ACCOUNTS UPON SALE OR EXCHANGE OF COMPANY INTERESTS. Upon the sale or exchange of an Interest, the Capital Account of the selling or exchanging Member will be transferred to the transferee on a pro rata basis.

3.7   REVALUATION OF CAPITAL ACCOUNTS UPON OCCURRENCE OF CERTAIN EVENTS.

(a)   Contributions. In accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(f) if, after the initial capital is contributed pursuant to Section 3.1, money or Property in other than a de minimis amount is contributed to the Company in exchange for an Interest, the Capital Accounts of the Interest Holders and Carrying Values of all the Company's Property (determined immediately prior to such issuance) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each such Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such issuance and had been allocated to the Interest Holders in accordance with Article 4. In determining the Unrealized Gain or Unrealized Loss, the fair market value of Company Property shall be determined in good faith by the Members.

(b)   Distributions. In accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(f), if money or Company Property in other than a de minimis amount is distributed to an Interest Holder in exchange for all or part of an Interest, the Capital Accounts of the Interest Holders and the Carrying Values of all the Company's Property (determined immediately prior to such distribution) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each item of Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such distribution and had been allocated to the Interest Holders in accordance with Article 4. In determining the Unrealized Gain or Unrealized Loss, the fair market value of the distributed Property shall be determined in good faith by the Members.

(c)   Adjustments. If there is a revaluation pursuant to this Section 3.7, then Capital Accounts shall thereafter be adjusted for allocations of depreciation (cost recovery) and gain or loss in accordance with the provisions in § 1.704-1(b)(2)(iv)(f) and (g) and the Interest Holders' distributive shares of gain or loss computed in accordance with the principles of Code § 704(c) and the regulations promulgated thereunder using the method selected by the Members.

3.8   NO CERTIFICATES OF OWNERSHIP. The respective Interests of the Interest Holders in the Company are not required to be represented by any certificate or document other than this Agreement.

ARTICLE 4
ALLOCATIONS AND DISTRIBUTIONS

4.1    **ALLOCATION OF PROFITS AND LOSSES.**

(a)    After giving effect to the special allocations set forth in Sections 4.2, 4.3 and 4.4, Profits and Losses for each fiscal year of the Company shall be allocated among the Interest Holders according to their respective Sharing Ratios.

(b)    The Losses allocated pursuant to Section 4.1(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Interest Holder to have an Adjusted Capital Account Deficit at the end of any fiscal year of the Company.  In the event some but not all of the Interest Holders would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1(a), the limitation set forth in this Section 4.1(b) shall be applied on an Interest Holder by Interest Holder basis so as to allocate the maximum permissible Losses to each Interest Holder under Treas. Reg. § 1.704(b)(2)(ii)(d).  All Losses in excess of the limitation set forth in this Section 4.1(b) shall be allocated to the Interest Holders that would not have an Adjusted Capital Account Deficit as a result of such allocation of Losses (in proportion to their relative Sharing Ratios).

4.2    **SPECIAL ALLOCATIONS.**  Items of income, gain, loss and deduction shall be allocated in accordance with the provisions of this Section 4.2 without regard to the allocation provisions contained in Section 4.1 in the following order:

(a)    Qualified Income Offset.  If any Interest Holder Capital Account is unexpectedly adjusted for, or such Interest Holder is unexpectedly allocated or there is unexpectedly distributed to such Interest Holder any item described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), § 1.704-1(b)(2)(ii)(d)(5) and § 1.704-1(b)(2)(ii)(d)(6), and such treatment creates or increases an Interest Holder's Adjusted Capital Deficit, then without regard to the allocation provisions provided in Section 4.1, the Company shall specially allocate to such Interest Holder items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by under Treas. Regs. issued pursuant to Code § 704, such Interest Holder's Adjusted Capital Deficit  as quickly as possible, provided that an allocation pursuant to this Section 4.2(a) shall be made only if and to the extent that such Interest Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.2(a) were not in this Agreement.  This Section 4.2(a) is intended to constitute a "qualified income offset" within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.  If there is an allocation to an Interest Holder pursuant to this Section 4.2(a), then future allocations of Profits pursuant to Section 4.1 shall be adjusted so that those Interest Holders who were allocated less income or a greater amount of loss, by reason of the allocation made pursuant to this Section 4.2(a) shall be allocated additional Profits in an equal amount.

(b)    Gross Income Allocation. In the event that an Interest Holder has a deficit Capital Account at the end of any Company fiscal year that is in excess of the sum of (i)

the amount the Interest Holder is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount the Interest Holder is deemed to be obligated to restore pursuant to Treas. Reg. §1.704-2(g) and § 1.704-2(i)(5), the Interest Holder shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made if and to the extent that the Interest Holder would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 4 have been tentatively made as if Section 4.2(a) and Section 4.2(b) were not in this Agreement.

(c)    <u>Minimum Gain Chargeback</u>.  If there is a net decrease in "partnership minimum gain" (as defined in Treas. Reg. §1.704-2(b)(2)) for the fiscal year, then, to the extent required by the Treasury Regulations, items of Company income and gain shall be specially allocated to the Interest Holders in an amount equal to each Interest Holder's share of the net decrease in partnership minimum gain (determined in accordance with the provisions of Treas. Reg. §1.704-2(g)(2)).  This Section 4.2(c) shall be interpreted consistently with, and subject to the exceptions contained in, Treas. Reg. §1.704-2(f).  It is the intention of the parties that this provision constitutes a "minimum gain chargeback" within the meaning of Treas. Reg. §1.704-2(f).

(d)    <u>Member Minimum Gain Chargeback</u>.  If there is a net decrease in "partner nonrecourse debt minimum gain" (as defined in Treas. Reg. §1.704-2(i)(2)) for the fiscal year, then, to the extent required by the Treasury Regulations, items of Company income and gain shall be specially allocated to the Interest Holders in an amount equal to each Interest Holder's share of the net decrease in partner nonrecourse debt minimum gain (determined in accordance with the provisions of Treas. Reg. §1.704-2(i)(5)).  This Section 4.2(d) shall be interpreted consistently with, and subject to the exceptions contained in, Treas. Reg. §1.704-2(i)(4).  It is the intention of the parties that this provision constitutes a "minimum gain chargeback" within the meaning of §1.704-2(i)(4).

(e)    <u>Nonrecourse Deductions</u>.  "Nonrecourse deductions" (as defined in Treas. Reg. §1.704-2(c)) shall be allocated in the same manner as Net Loss is required to be allocated pursuant to Section 4.1.

(f)    <u>Member Nonrecourse Deductions</u>.  "Partner nonrecourse deductions" (as defined in Treas. Reg. §1.704-2(i)(2)) shall be specially allocated to the Interest Holders who bear the economic risk of loss for the liability to which the deductions are attributable, determined in accordance with the principles of Treas. Reg. §1.704-2(i).

4.3    **CURATIVE ALLOCATIONS**.  The allocations set forth in Section 4.2 ("**Regulatory Allocations**") are intended to comply with certain requirements of Treas. Reg. §1.704-1(b). Notwithstanding any other provision of this Article 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gain, loss and deduction among the Interest Holders so that, to the extent possible, the net amount of such allocations of other profits, losses and other items and the Regulatory Allocations to each Interest Holder shall be equal to the amount that would have been allocated if the Regulatory Allocations had not occurred.

4.4    CODE SECTION 704(C) ALLOCATIONS.    In accordance with Code §704(c), income, gain, loss and deduction concerning any Contributed Property shall, solely for tax purposes, be allocated among the Interest Holders to take account of any variation between the adjusted tax basis of such Property and the fair market value of such Property upon contribution in accordance with the method selected by the Members under Treas. Reg. §1.704-3. If the value of any Company Property is adjusted under Section 3.7 of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such Property shall take account of any variation between its adjusted tax basis for federal income tax purposes and its Carrying Value in the same manner as under Code §704(c) using such method as the Members shall determine. Allocations under this Section 4.4 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Interest Holder's Capital Account.

4.5    ALLOCATIONS CONCERNING TRANSFERRED INTERESTS.    Unless the Code requires otherwise, any Profits or Losses allocable to an Interest that has been transferred during any year shall be allocated among the Persons who were holders of such Interest during such year by taking into account their varying interests during such taxable year in accordance with Code §706(d) and using any convention selected by the Members.

4.6    DISTRIBUTIONS OF NET CASH FLOW.    Except as otherwise provided in Sections 4.9 and 10.3, some or all of Net Cash Flow shall be distributed to the Interest Holders in accordance with the Sharing Ratios of the respective Interest Holders as of the date of such distribution, at the discretion of the Members.

4.7    OTHER ALLOCATION RULES.

(a)    Profits or Losses and Profits or Losses shall be determined on a daily, monthly or other basis using any convention or method selected by the Members and permitted by Code §707 and the Treasury Regulations thereunder.

(b)    Excess nonrecourse liabilities of the Company (as defined in Treas. Reg. §1.752-3(a)(3)) shall be shared among the Interest Holders in accordance with their respective Sharing Ratios.

4.8    WITHHOLDING AND REPORTING OBLIGATIONS.    The Members shall cause the Company to comply with the withholding requirements of Code §§1441-1446 and any and all tax reporting requirements that may be applicable to any distributions to Interest Holders.

4.9    MANDATORY TAX DISTRIBUTIONS.    Notwithstanding the provisions of Section 4.6, to the extent the Company has sufficient Net Cash Flow with respect to a fiscal year, the Company shall distribute not later than ninety (90) days after the close of each fiscal year an amount which the Members determine is necessary for the Interest Holders to pay the federal, state and local income taxes on their distributive shares of the Company's income. In determining the income taxes of the Interest Holders, the Members shall assume all Interest Holders are in the highest marginal income tax brackets then in effect. Any such distributions to pay taxes shall be allocated to the Interest Holders in the same manner as the allocation of Profits under Section 4.1.

4.10   **OTHER DISTRIBUTIONS.**   All distributions other than distributions of Net Cash Flow under Section 4.6, mandatory tax distributions under 4.9, and final distributions under Section 10.3 shall be made at the discretion of the Members in proportion to the Interest Holders' positive Capital Account balances until all such Capital Account balances equal zero.

4.11   **DISTRIBUTIVE SHARES.**   For purposes of Subchapter K of the Code, the distributive shares of the Interest Holders of each item of Company taxable income, gains, losses, deductions or credits for any fiscal year of the Company shall be in the same proportions as their respective shares of Profits or Losses as allocated to them under this Article 4. Notwithstanding the foregoing, to the extent not inconsistent with the allocation of gain provided for in Section 4.1(a), gain recognized by the Company which represents recapture of depreciation or cost recovery deductions for Federal income tax purposes shall be allocated among the Interest Holders in accordance with Treas. Reg. § 1245-1(e) (without regard to whether property is personal property or real property).

ARTICLE 5
MEMBER REPRESENTATIONS; DISPOSITIONS OF INTERESTS

5.1   **INITIAL MEMBERS.**   The initial Members of the Company are the Persons executing this Agreement as Members as of the date of this Agreement, each of which is admitted to the Company as a Member effective contemporaneously with the execution by such Person of this Agreement.

5.2   **REPRESENTATIONS AND WARRANTIES.** Each Member hereby represents and warrants to the Company and to each other Member that: (a) if that Member is a corporation, it is duly organized, validly existing, and in good standing under the law of the state of its incorporation and is duly qualified and in good standing as a foreign corporation in the jurisdiction of its principal place of business (if not incorporated therein); (b) if that Member is a limited liability company, it is duly organized, validly existing, and in good standing under the law of the state of its organization and is duly qualified and in good standing as a foreign limited liability company in the jurisdiction of its principal place of business (if not organized therein); (c) if that Member is a partnership, trust, or other entity, it is duly formed, validly existing, and in good standing under the law of the state of its formation, and if required by law is duly qualified to do business and in good standing in the jurisdiction of its principal place of business (if not formed therein) and the representations and warranties in clauses (a)-(c), as applicable, are true and correct with respect to each partner, trustee, or other member thereof; (d) the Member has full corporate, trust, or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all necessary actions by the board of directors, shareholders, members, trustees, beneficiaries, partners or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken; (e) the Member has duly executed and delivered this Agreement; (f) the Member's authorization, execution, delivery, and performance of this Agreement does not conflict with (i) any law, rule or court order applicable to that Member, (ii) that Member's articles of incorporation, bylaws, partnership agreement, operating agreement or articles of organization, or (iii) any other agreement or arrangement to which that Member is a party or by which it is bound; (g) the Member is acquiring its Interest for its own account for investment and not with a view to the resale or distribution thereof; (h) the Member has, alone or together with

its purchaser representative (if any), such knowledge and experience in financial matters that it is capable of evaluating the relative risks and merits of this investment; (i) the Member has adequate means of providing for its current needs and contingencies and has no need for liquidity in this investment; (j) all documents and records requested by the Member have been delivered or made available to it, the Member has had the opportunity to ask questions of the Members and the Member's investment decision is based upon its own investigation and analysis and not the representations or inducements of any Person, and (k) the Member understands that the Interests have not been, and will not be registered under the Securities Act of 1933, as amended, in reliance upon applicable exemptions from registration.

5.3    **RESTRICTION ON TRANSFER OF INTERESTS.**

(a)    <u>Voluntary Transfers</u>. The parties have agreed that it is not desirable that any of the Company Interests be sold or transferred because the Members desire to provide for continuity of management of the Company. The parties desire to ensure that no third-party becomes a Member or the holder of a Company Interest without the consent of the Members holding at least seventy-five percent (75%) of the Interests. The parties believe it is in the best interest of the Company and the Members to restrict the Transfer of Company Interests in the following manner. No Interest Holder may Transfer a Company Interest without (i) compliance with the provisions of this <u>Section 5.3</u>, and (ii) delivering to the Company a signed certification of the transferee that such transferee is aware of, and agrees to be bound by, the provisions of this Agreement. Any attempted Transfer of a Company Interest, or any part thereof, without such compliance shall be, and is hereby declared, null and void *ab initio*. The Members agree that the foregoing transfer restriction is intended to permit the harmonious operation of the Company's business, is reasonable in view of the Company's purpose and the relationship of the Interest Holders, and may be specifically enforced by the Company and each Interest Holder.

(b)    <u>Third Party Offer to Purchase Interest</u>. If at any time an Interest Holder ("**Offering Interest Holder**") receives an offer from a third party ("**Third Party Offer**") to purchase some or all of its Company Interests ("**Offered Interests**") that it desires to accept, such Offering Interest Holder shall immediately deliver to the other Interest Holders ("**Nonselling Interest Holders**") and the Manager on behalf of the Company written notice of such Third Party Offer ("**Offer Notice**"), which Offer Notice shall include a true and correct copy of the Third Party Offer. The Offer Notice shall include a request by the Offering Interest Holder that the Manager approve the sale or purchase of the Offered Interests under the terms provided in the Third Party Offer.

(i)    <u>Right of First Refusal to Company</u>. The Company, upon action by the Manager, shall have a period of ten (10) days ("**Company Option Period**") after the receipt of the Offer Notice to notify the Offering Interest Holder in writing of its election to have the Company purchase the Offered Interests for the same price and on the same terms and conditions as are set forth in the Third Party Offer or, if the Third Party Offer contemplates payment in whole or in part in property, at the cash equivalent of such Third Party Offer. If the Company fails to respond within the Company Option Period, it shall be deemed to have elected

not to purchase the Offered Interests. If the Company exercises its option to purchase the Offered Interests, the Company shall enter into an agreement of purchase and sale with the Offering Interest Holder ("**Company Sale Contract**"), which shall be for the same price and on the same terms and conditions contained in the Third Party Offer.

(ii)     Right of First Refusal to Interest Holders. If the Company fails to exercise its option to purchase the Offered Interests, the Nonselling Interest Holders shall have a period of ten (10) days following the expiration of the Company Option Period ("**Interest Holder Option Period**") to notify the Offering Interest Holder in writing of their desire to purchase a Proportionate Share of the Offered Interests for the same price and on the same terms and conditions as are set forth in the Third Party Offer. If one or more of the Nonselling Interest Holders exercise their option to purchase the Offered Interests, the Nonselling Interest Holders so exercising such option shall on a pro rata basis as among themselves enter into an agreement of purchase and sale with the Offering Interest Holder ("**Interest Holder Sale Contract**"), which shall be for the same price and on the same terms and conditions contained in the Third Party Offer. If the Nonselling Interest Holders fail to respond within the Interest Holder Option Period or they collectively fail to exercise options to purchase all of the Offered Interests, they shall be deemed to have elected not to purchase the Offered Interests.

(iii)     Default by Nonselling Interest Holders or Company. In the event the Nonselling Interest Holders or the Company default in the obligations under the Company Sale Contract or Interest Holder Sale Contract, as applicable, the Offering Interest Holder shall be entitled to all rights and remedies under such contracts.

(iv)     Sale to Third Party. If (i) neither the Company nor the Nonselling Interest Holders timely exercise their option to purchase the Offered Interests and (ii) the requirements of Section 5.5 are satisfied, the Offering Interest Holder shall be free to sell the Offered Interests to the maker of the Third Party Offer at the price and upon the terms not less favorable to the Offering Interest Holder than those set forth in the Offer Notice, so long as such sale is consummated within ten (10) days from the close of the Interest Holder Option Period. If the Offered Interests are not sold within such 10-day period, the Offered Interests shall again be subject to the provisions of this Section 5.3(b).

(v)     Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder, but shall not become a Member. The successor Interest Holder shall have all the rights of an Interest Holder, but shall not by virtue thereof be entitled to the benefits of membership (other than the liquidation value of such Interest) until admitted in accordance with Section 5.5.

5.4    **EFFECTIVENESS OF ASSIGNMENT.**  No Transfer shall be effective unless and until (i) the transferor delivers to the Company an unqualified opinion or opinions of counsel in form and substance satisfactory to counsel designated by the Members that neither the Transfer nor any offering in connection therewith violates any provision of any federal or state securities law; and (ii) the transferee executes a statement that it is acquiring such Interest or such part thereof for its own account for investment and not with a view to distribution, fractionalization or resale thereof.  The Transfer by an Interest Holder of all or part of its Interest shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Article 5 have been met, and the Company has received a transfer fee sufficient to cover all expenses incurred by the Company in connection with such Transfer; provided, however, that the Members may elect to waive such transfer fee in their sole discretion.  All distributions prior to the effective date shall be made to the transferor and all distributions made thereafter shall be made to the transferee.  Should any Interest be transferred hereunder to any Person who is not a citizen and resident of the United States, the Company shall comply with and satisfy all applicable tax withholding requirements, including but not limited to, §§ 1441, 1442 and 1446 of the Code.

5.5    **REQUIREMENTS FOR ADMISSION.**  No transferee of the whole or a portion of a Member's Interest shall have the right to become a Member unless and until all of the following conditions are satisfied:

(a)    the transferor and transferee execute and acknowledge, and cause such other Persons to execute and acknowledge, such other instruments and provide such other evidence as the Members may reasonably deem necessary or desirable to effect such admission, including without limitation: (A) the written acceptance and adoption by the transferee of the provisions of this Agreement (including any amendments), including a representation and warranty that the representations and warranties in Section 5.2 are true and correct with respect to the transferee; (B) the transferee's completion of a purchaser qualification questionnaire that will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of an exemption from registration under the Securities Act of 1933, as amended, and relevant state law; (C) the transferee's completion, if applicable, of an acknowledgment of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of an exemption from registration under the Securities Act of 1933, as amended, and relevant state law; and (D) any other documents counsel for the Company deems necessary; and

(b)    the admission is approved by the Members as provided in Section 5.3(a).

5.6    **WITHDRAWAL.**  No Member shall have the right or power to voluntarily withdraw from the Company.

5.7    **LIABILITY TO THIRD PARTIES.**  No Member shall, by virtue of its status as a Member or its ownership of an Interest, be liable for the debts, obligations or liabilities of the Company, including, but not limited to a judgment, decree or order of a court.

5.8    **CONFLICTS OF INTEREST.**    Subject to the other express provisions of this Agreement and any other applicable agreement with the Company, each Member, at any time and from time to time, may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation to offer to the Company or any other Member, or other Person the right to participate therein. The Company may transact business with any Member, or an Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company would obtain from unrelated third parties.

5.9    **INFORMATION; CONFIDENTIALITY.**

(a)    In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

(b)    The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member, except for disclosures: (i) compelled by law (but the Member must notify the Company and the other Members promptly of any request for that information, before disclosing it if practicable); (ii) to advisers or representatives of the Member or Persons to which that Member's Company Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 5.9; (iii) of information that the Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality; or (iv) information that is generally known or available to the public.

(c)    Each Member acknowledges that a breach of the provisions of this Section 5.9 may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section 5.9 may be enforced by specific performance without posting bond (or, if bond is nevertheless required, the Members agree to set such bond at the lowest amount permitted by law).

ARTICLE 6
OPERATIONS; INDEMNIFICATION

6.1    **MANAGEMENT OF COMPANY.**    Subject to the provisions of this Agreement, the Members shall have the sole and exclusive right to carry out any and all of the objectives and purposes of the Company in the name of the Company and to perform all acts and enter into and perform all contracts and other undertakings that they may in their discretion deem necessary or advisable or incidental thereto, all in accordance with the terms of this Agreement. The Members delegate such authority to William Hilliard and Steve Bevan as Managers. The

Managers may act individually or jointly and in the event of a deadlock among the Managers (if more than one), such decision shall be resolved by vote of the Members.

6.2    **TERM OF MANAGER.**  The Manager(s) shall serve until the earlier of the appointment of his successor or his resignation or removal.   The Members, in their sole discretion, may remove any Manager at any time, for any reason or no reason at all.

6.3    **AUTHORITY.**  Notwithstanding the foregoing provisions of Sections 6.1, and without limiting the validity of other provisions of this Agreement requiring unanimous Member approval, the following actions shall require the approval of all of the Members holding seventy-five percent (75%) or more of the Interests:

(i)    selling or otherwise disposing of, or agreeing to sell or otherwise dispose of, substantially all the assets of the Company, except in a liquidating sale upon dissolution of the Company in accordance with this Agreement;

(ii)    merging or consolidating with any other Person;

(iii)    making, executing, or delivering any assignment for the benefit of creditors;

(iv)    incurring indebtedness for borrowed money outside the ordinary course of business;

(v)    incurring indebtedness for borrowed money or refinancing, recasting, increasing, modifying, or extending any indebtedness for borrowed money of the Company where the amount involved exceeds $25,000;

(vi)    commencing or settling any litigation where the amount involved exceeds $25,000;

(vii)    guarantying the obligation of any Person outside the ordinary course of business or where the amount involved exceeds $5,000;

(viii)    doing any act in contravention of this Agreement;

(ix)    doing any act that would make it impossible to carry on the business of the Company except upon the dissolution of the Company in accordance with this Agreement;

(x)    confessing a judgment against the Company;

(xi)    using any funds or assets of the Company other than for the benefit of the Company;

(xii)    possessing property of the Company or assigning any rights in specific property of the Company for other than a Company purpose of the Company;

(xiii)   admitting a new Member; or

(xiv)   knowingly taking any action that would subject any Member in its capacity as a Member to personal liability in any jurisdiction.

(b)   The Members shall have the right to delegate to the Officers and such other Persons as they deem appropriate the authority to conduct the day to day operations of the Company.

6.4   **VOTING RIGHTS.**   Each Member shall be entitled to vote according to its respective Sharing Ratio.

6.5   **QUORUM.**   The presence of a Required Interest shall constitute a quorum for transaction of business at any meeting of the Members.

6.6   **MANNER OF ACTING.**   The act of a Required Interest shall be the act of the Members, unless the act of a greater number is required by statute, this Operating Agreement or the Articles of Organization.   As a matter of clarification, (i) the Members can only take action with the consent of a Required Interest, and (ii) no single Member can take any action that is binding upon the Company without the consent and approval of a Required Interest.

6.7   **MEETINGS OF MEMBERS.**   The Members shall meet at such times and at such places as may be determined by the Members.

6.8   **TELEPHONIC MEETINGS.**   The Members may participate in and act at any meeting of the Members through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such meeting shall constitute attendance and presence in person at the meeting of the Member so participating.

6.9   **ACTION WITHOUT A MEETING.**   Any action which may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members entitled to vote with respect to the subject matter thereof having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which the holders of all of the Interests entitled to vote at a meeting were present and voting.   Prompt notice of the taking of the action without a meeting by less than unanimous consent shall be given in writing to those members who were entitled to vote but did not consent in writing.

6.10   **EXPENSES.**   The Company may pay or reimburse the Members for (i) legal, accounting and other professional fees; (ii) due diligence expenses; (iii) transaction costs for portfolio investments; and (iv) taxes or other governmental charges of the Company, if any, incurred by them that are directly attributable to the business of the Company, but only upon the approval of all of the Members.

ARTICLE 7
INDEMNIFICATION

7.1    **RIGHT TO INDEMNIFICATION.** Subject to the limitations and conditions provided in this Article 7 and in the Act, each Person ("**Indemnified Person**") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, including derivative claims ("**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was a Member, or is or was serving at the request of the Company as a manager, director, officer, partner, member, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding if there is a determination that such Indemnified Person acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which it reasonably believed to be in or not opposed to best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that its conduct was unlawful.

7.2    **DETERMINATIONS.** Any indemnification under Section 7.1 (unless ordered by a court) shall be made by the Company only as authorized in the specific case, upon a determination that indemnification is proper in the circumstances because such Person has met the applicable standard of conduct set forth therein. Such determination shall be made by the Members (excluding any Member who is an Indemnified Person with respect to the matter in question). If no Member is eligible to make such determination, the determination shall be made by independent legal counsel in a written opinion.

7.3    **SURVIVAL.** Indemnification under this Article 7 shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 7 shall be deemed contract rights, and no amendment, modification or repeal of this Article 7 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

7.4    **ADVANCE PAYMENT.** The rights to indemnification conferred by this Article 7 shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its/its good faith belief

that it has met the standard of conduct necessary for indemnification under this Article 7 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such Person is not entitled to be indemnified under this Article 7 or otherwise.

7.5    **INDEMNIFICATION OF OFFICERS, EMPLOYEES AND AGENTS.**  The Company, by action of the Members, may indemnify and advance expenses to an officer, employee or agent of the Company, to the same extent and subject to the same conditions under which it may indemnify and advance expenses to a Member under this Article 7; and the Company may indemnify and advance expenses to Persons who are not or were not officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against it and incurred by it in such a capacity or arising out of its status as such a Person to the same extent that it may indemnify and advance expenses to a Member under this Article 7.  Any Person indemnified pursuant to this Section 7.5 shall be considered an "Indemnified Person."

7.6    **APPEARANCE AS WITNESS.**  Notwithstanding any other provision of this Article 7, the Company may pay or reimburse expenses incurred by a Member in connection with its appearance as a witness or other participation in a Proceeding at a time when such Member is not a named defendant or respondent in the proceeding.

7.7    **NON-EXCLUSIVITY OF RIGHTS.**   The right to indemnification and the advancement and payment of expenses conferred by this Article 7 shall not be exclusive of any other right which a Member or other Person may have or hereafter acquire under any law (common or statutory), agreements, vote of the Members or otherwise.

7.8    **INSURANCE.**  The Company may purchase and maintain insurance, at its expense, to protect itself and any Indemnified Person against any expense, liability or loss, whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under this Article 7.

7.9    **SAVINGS CLAUSE.**  If any portion of this Article 7 is invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless (subject to the determination standard described in Section 7.1) any Indemnified Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the fullest extent permitted by any applicable portion of this Article 7 that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE 8
AMENDMENTS

8.1    **AMENDMENT OF AGREEMENT.**  This Agreement may be amended or modified from time to time only by a written instrument executed and agreed to by Members holding

seventy- five percent (75%) or more of the Interests; provided, however, that (a) an amendment or modification changing a Member's share of distributions or allocations or required contributions is effective only with that Member's consent; (b) an amendment or modification reducing the required measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the measure theretofore required; and (c) an amendment that would modify the limited liability of a Member is effective only with that Member's consent.

ARTICLE 9
BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

9.1   **MAINTENANCE OF BOOKS AND RECORDS.**  The Company shall keep books and records of accounts at its principal office.  In addition, the Company shall maintain the following at its principal office:

      (a)   A current list of the full name and last known business address of each Interest Holder, separately identifying the Interest Holders in alphabetical order.

      (b)   A copy of this Agreement and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any document has been executed;

      (c)   Copies of the Company's federal, state and local income tax returns and reports and financial statements, if any, for the three (3) most recent years;

      (d)   Minutes of every annual, special and court-ordered meeting of the Members;

      (e)   Any written consents obtained from Members for actions taken by Members without a meeting; and

      (f)   Any other documents required to be maintained by the Act.

Records kept pursuant to this Section 9.1 are subject to inspection and copying at the reasonable request, and at the expense, of any Member during ordinary business hours.

9.2   **REPORTS.**  On or before the 90th day following the end of each fiscal year during the term of the Company, the Members shall cause each Member to be furnished with a federal (and where applicable state) income tax report on Form K-1 or its equivalent and a financial report for the preceding fiscal year which shall include a balance sheet and a profit and loss statement prepared in accordance with generally accepted accounting principles applied on a consistent basis.  In addition, a quarterly unaudited summary of operating results of the Company will be furnished to each Member.

9.3   **TAXABLE YEAR AND ACCOUNTING METHOD.**  The Company's taxable and fiscal years shall be the calendar year.  The Company shall initially use the cash method of accounting.

9.4    TAX ELECTIONS.  All elections required or permitted to be made by the Company under the Code or under state or local tax laws shall be made by the Members.  In particular:

(a)    The Company may elect to deduct expenses incurred in organizing the Company ratably as provided in Code §709;

(b)    In case of a Transfer of all or part of any Interest the Company may elect, in a timely manner pursuant to Code §754 and pursuant to corresponding provisions of applicable state and local tax laws, to adjust the basis of Company Property pursuant to Code §§734 and 743 and shall elect to adjust the basis of Company Property with respect to the transfer of Douglas Wilson's interest by reason of his death;

(c)    The Company may elect to deduct start-up expenditures ratably as provided in Code §195;

(d)    The Company shall not elect to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or corresponding provisions of state or local law; and

(e)    The Company shall make any and all elections or take whatever actions may be necessary under the Code, Treasury Regulations, applicable state and local laws, and applicable Federal, state and local administrative regulations or pronouncements to cause the Company to be treated as a partnership for federal, state and local income tax purposes.

9.5    BANK ACCOUNTS.  All funds of the Company are to be deposited in the Company's name in such bank accounts or investment accounts as may be designated by the Members and shall be withdrawn on the signature of a Member.  The Company's funds may not be commingled with the funds of any Member.

9.6    TAX MATTERS PARTNER.  William Hilliard shall be the "tax matters partner" of the Company for purposes of Code §6231(a)(7); or, if he cannot so serve for any reason, the "tax matters partner" shall be a Member that is designated as such by the vote of a Required Interest.

ARTICLE 10
DISSOLUTION, LIQUIDATION AND TERMINATION

10.1    EVENTS OF DISSOLUTION.  The Company shall be dissolved and shall commence winding up its affairs upon the first to occur of the following:

(a)    The consent of the Members holding seventy-five percent (75%) or more of the Interests; or

(b)    The happening of any other event causing the dissolution of the Company under the Act; provided, however, that in the event the Company is administratively dissolved under the Act, upon the approval of all of the Members, the Company shall have the authority to apply for reinstatement as provided under the Act.

10.2    **WINDING UP.**  Upon the dissolution of the Company, the Members shall wind up the Company's affairs and satisfy the Company's liabilities.  The Members shall attempt to liquidate all of the Company Property as quickly as possible consistent with obtaining the full fair market value of said Property.  During this period, the Members shall continue to operate Company Property and all of the provisions of this Agreement shall remain in effect.  The Members shall notify all known creditors and claimants of the dissolution of the Company in accordance with the provisions of the Act.

10.3    **FINAL DISTRIBUTION.**  The proceeds from the liquidation of the Company Property shall be distributed as follows:

(a)    First, to creditors, including Interest Holders who are creditors, until all of the Company's debts and liabilities are paid and discharged (or provision is made for payment thereof); and

(b)    Second, to the Interest Holders, to the extent of their positive Capital Account balances, in proportion to their relative Capital Accounts as of the date of such distribution, after giving effect to all contributions, distributions, and allocations for all periods.

(c)    Third, the balance, if any, in proportion to the Member's Sharing Ratio.

All liquidating distributions shall be made so as to comply with the requirements of Treas. Reg. §1.704-1(b)(2)(ii)(b)(2).

10.4    **DISTRIBUTIONS IN KIND.**  In connection with the dissolution and liquidation of the Company, the Members shall attempt to sell all of the Company Property.  To the extent that the Company Property is not sold, each Interest Holder will receive a pro rata share of any distribution in kind.  Any Company Property distributed in kind upon liquidation of the Company shall be valued in good faith by the Members, and treated as though the Property were sold and the cash proceeds distributed.

10.5    **NO RECOURSE AGAINST THE MEMBERS.**  The Interest Holders shall look solely to the assets of the Company for the return of their investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return such investment, they shall have no recourse against any other Interest Holder.

10.6    **PURCHASE BY MEMBER OR AFFILIATE.**  Any Member or an Affiliate of any Member may, if it so desires, purchase an item of Company Property upon liquidation provided that: (a) the purchase price is at fair market value as determined in good faith by the Members; and (b) at least ten (10) days' advance notice of the proposed sale has been given to all other Members.

10.7    **DEFICIT CAPITAL ACCOUNTS.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Interest Holder upon dissolution of the Company shall not be an asset of the Company and such Interest Holder shall not be obligated to contribute

such amount to the Company to bring the balance of such Interest Holder's Capital Account to zero.

10.8   **TERMINATION FILINGS.** On completion of the distribution of Company Property as provided herein, the Company is terminated, and the Members (or such other Person or Persons as the Act may require or permit) shall cancel any filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the Company.

ARTICLE 11
GENERAL PROVISIONS

11.1   **ENTIRE AGREEMENT.** This Agreement embodies the entire understanding among the Members concerning the Company and their relationship as Members and supersedes and all prior negotiations, understanding or agreements.

11.2   **NOTICES.** All notices and demands required or permitted under this Agreement shall be in writing, as follows: (i) by actual delivery of the notice into the hands of the party entitled to receive it; (ii) by mailing such notice by registered or certified mail, return receipt required, in which case the notice shall be deemed to be given on the date of its mailing; (iii) by any recognized overnight carrier, in which case the notice shall be deemed to be given as of the date sent; or (iv) upon transmission of a confirmed fax. All notices which concern this Agreement shall be addressed as follows:

(a)   If given to the Company, to the Company at its principal office; and

(b)   If given to an Interest Holder, to the Interest Holder at the address set forth in the records of the Company.

11.3   **SEVERABILITY.** If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected.

11.4   **PARTIES BOUND.** This Agreement shall be binding upon the Members and their respective successors, assigns, heirs, devisees, legal representatives, executors and administrators.

11.5   **GOVERNING LAW; JURISDICTION.** This Agreement shall be governed by the laws of the Commonwealth of Kentucky without regard to its conflicts of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Members in the courts of the Commonwealth of Kentucky, County of Fayette, or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of Kentucky, and each of the Members consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

11.6   **STRICT CONSTRUCTION.** It is the intent of the Members upon execution hereof that this Agreement shall be deemed to have been prepared by all of the parties to the end that no

Member shall be entitled to the benefit of any favorable interpretation or construction of any term or provision hereof under any rule or law.

11.7   **PARTITION.** Each Member irrevocably waives any right that it may have to maintain any action for partition with respect to Company Property.

11.8   **HEADINGS.** The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.9   **COUNTERPARTS.** This Agreement may be executed in multiple counterparts with separate signature pages, and each such counterpart shall be considered an original, but all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission will constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile will be deemed to be their original signatures for any purpose whatsoever.

11.10   **PRONOUNS.** All pronouns shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

11.11   **EFFECT OF WAIVER OR CONSENT.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its/its obligations hereunder or with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person. Failure on the part of a Person to complain of any act or to declare any Person in default hereunder, irrespective of how long that failure continues, does not constitute a waiver by that Person of its/its rights with respect to that default.

11.12   **FURTHER ASSURANCES.** Each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated herein.

11.13   **INDEMNIFICATION FOR BREACH.** To the fullest extent permitted by law, each Member shall indemnify the Company and each other Member and hold all of them harmless from and against all losses, costs, liabilities, damages and expenses (including, without limitation, costs of suit and attorneys' fees) they may incur on account of any material breach by that Member of this Agreement.

11.14   **ARBITRATION.** Any disputes under this Agreement which cannot be resolved by the affected parties shall be submitted arbitration, with arbitrator to be selected in the following manner:  (a) if possible, by agreement of the affected parties, and (b) if the affected parties cannot agree, each will select an arbitrator and the two arbitrators so selected shall select a third, who shall preside over the arbitration. Such proceedings shall also be governed by rules for such proceedings which are customarily employed for such proceedings, such as the commercial arbitration rules promulgated by the American Arbitration Association.

11.15  **DISCLOSURE AND WAIVER OF CONFLICTS.**  In connection with the preparation of this Agreement, the Members acknowledge and agree that:  (i) the attorney that prepared this Agreement ("**Attorney**") acted as legal counsel to the Company; (ii) the Members have been advised by the Attorney that the interests of the Members may be opposed to each other and, accordingly, the Attorney's representation of the Company may not be in the best interests of the Members; and (iii) each of the Members has been advised by the Attorney of their right to retain separate legal counsel.  Notwithstanding the foregoing, the Members (i) desire the Attorney to represent the Company; (ii) acknowledge that they have been advised of their right to retain separate counsel and have either done so or have waived their right to do so; and (iii) jointly and severally forever waive any claim that the Attorney's representation of the Company constitutes a conflict of interest.

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first set forth above.

GENCANNA GLOBA USAL, INC.

By _____

As its: _____CoO_____

101 ENTERPRISES, LLC

By _____

As its: _____

GMA\wrh\hemp\4274 Colby, LLC\Operating Agreement Final 5-30-2015

**SCHEDULE A**
**to the**
**Operating Agreement**
**of**
**4274 COLBY, LLC**

| Name of<br>Each Member | Capital<br>Contribution | Sharing Ratio |
|---|---|---|
| GenCanna Global USA, Inc.<br>4274 Colby Road<br>Winchester, KY  40391 | $100,000 | 50.0% |
| 101 Enterprises, LLC<br>4274 Colby Road<br>Winchester, KY  40391 | $100,000 | 50.0% |
| Total | $200,000 | 100% |

**EXHIBIT A**
**to the**
**Operating Agreement**
**of**
**4274 COLBY, LLC**

The capitalized words and phrases used in this Agreement, unless the context clearly indicates otherwise, shall have the meanings as follows:

**"Act"** means the Kentucky Limited Liability Company Act, KRS 275.001 et seq., and any successor statute, as amended from time to time.

**"Adjusted Capital Account Deficit"** means, with respect to any Interest Holder, the deficit balance, if any, in such Interest Holder's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

  (i)    credit to such Capital Account any amounts which such Interest Holder is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treas. Reg. §§ 1.704-2(g)(i) and 1.704-2(i)(5); and

  (ii)   debit to such Capital Account the items described in §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**"Affiliate"** of a Person means: (a) any entity or individual that directly or indirectly controls or holds the power to vote 10% or more of the outstanding voting securities of such other Person; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director or member of such other Person; (e) if such other Person is an officer, director, or member of any entity, the entity for which such Person acts in any such capacity; (f) the spouse, minor children, parents and siblings of such other Person; and (g) any trust or similar arrangement of which such other Person is the trustee or custodian or the beneficiary.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

**"Agreed Value"** of any Contributed Property means the fair market value of the Property at the time of contribution as determined in good faith by the Members.  Subject to Section 3.7, in the event that more than a single item of Property is contributed to the Company in a single or integrated transaction, the Members shall use such method as they deem reasonable and

appropriate to allocate the aggregate Agreed Value of Contributed Properties among each separate Property in proportion to the respective fair market value of each such Property.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Book-Tax Disparity**" shall mean with respect to any item of Contributed Property or Revalued Property, as of the date of any determination, the difference between the Carrying Value of such Contributed Property or Revalued Property and the adjusted basis thereof for federal income tax purposes as of such date. A Member's share of the Company's Book-Tax Disparities in all of its Contributed Property and Revalued Property will be reflected by the difference between such Member's Capital Account balance, as maintained pursuant to Article 3, and the balance of such Member's Capital Account computed as if it had been maintained strictly in accordance with federal income tax accounting principles.

"**Capital Account**" means a separate capital account maintained for each Member on the books of the Company in accordance with Treas. Reg. §1.704-1(b)(2)(iv) and Article 3.

"**Capital Contributions**" means the total amount of capital contributed by a Member to the Company, as determined from time to time, including, without limitation, the Net Agreed Value of any Contributed Property, and amounts paid by a Member pursuant to a Member's guaranty of indebtedness of the Company.

"**Carrying Value**" means:

(a) With respect to a Contributed Property, the Agreed Value of such Property reduced (but not below zero) by all depreciation, depletion (computed as a separate item of deduction), amortization and cost recovery deductions charged to the Members' Capital Accounts;

(b) With respect to a Revalued Property, the fair market value of such Property at the time of revaluation, as determined in accordance with Section 3.7 hereof, reduced (but not below zero) by all depreciation, depletion, amortization and cost recovery deductions charged to the Members' Capital Accounts; and

(c) With respect to any other Company Property, the adjusted basis of such Property for federal income tax purposes, all as of the time of determination.

The Carrying Value of any Property shall be adjusted from time to time in accordance with Section 3.7 hereof.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company**" means 4274 Colby, LLC, a Kentucky limited liability company.

"**Company Interest**" or "**Interest**" means the interests of a Member or an assignee who is not admitted as a Member in the Company, including the right to any and all benefits to which

such Member or assignee may be entitled in accordance with this Agreement and the Act, and the obligations as provided in this Agreement and the Act.

"**Company Property**" or "**Property**" means properties, assets and rights of any type owned by the Company, including accounts receivable and goodwill.

"**Contributed Property**" means any Property contributed to the Company at any time or from time to time. Once the Carrying Value of Contributed Property has been adjusted pursuant to Section 3.7 hereof, such Property shall be deemed Revalued Property and shall no longer be deemed Contributed Property.

"**Interest Holders**" means Members and assignees of Interests in the Company who are not admitted as Members.

"**Involuntary Withdrawal**" means, with respect to any Member, the occurrence of any of the events set forth in KRS 275.280(1)(d)–(j).

"**Manager**" has the meaning set forth in Article 6.

"**Member**" means each Person who initially acquires a Company Interest from the Company pursuant to this Agreement and each Person hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any Person who has ceased to be a Member. The Members and their respective Interests are set forth on attached and incorporated Schedule A.

"**Net Agreed Value**" means:

(a)    In the case of any Contributed Property, the Agreed Value of such Property net of liabilities either assumed by the Company upon such contribution or to which such Property is subject when contributed to the Company, as determined in accordance with Code §752; and

(b)    In the case of any Property distributed to an Interest Holder, the fair market value of such Property at the time such Property is distributed, net of any indebtedness either assumed by such distributee Interest Holder upon such distribution or to which such Property is subject at the time of distribution determined in accordance with Code §752.

"**Net Cash Flow**" means all of the Company's liquid funds in excess of the amounts set aside for reserves by the Members.

"**Person**" means any individual, corporation, partnership, trust, joint venture, limited liability company or other entity.

"**Proceeding**" has the meaning given that term in Section 7.1.

"**Profits**" and "**Losses**" mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code §703(a)(including all items required to be stated separately) with the following adjustments:

(a)     Any income exempt from federal income tax shall be included;

(b)     Any expenditures of the Company described in Code §705(a)(2)(B) (including expenditures treated as such pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(i)) not otherwise taken into account in computing Profits or Losses shall be subtracted;

(c)     In the event any Company Property is revalued pursuant to Section 3.7, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Property;

(d)     Any items that are specially allocated pursuant to Sections 4.2, 4.3 and 4.4 shall not be taken into account in computing Profits or Losses;

(e)     Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Carrying Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Carrying Value; and

(f)     In the case of Property having a Book-Tax Disparity, in lieu of depreciation, amortization or other cost recovery deductions allowable under the Code ("Tax Depreciation"), there shall be taken into account for each Property a depreciation allowance that bears the same ratio to its initial Agreed Value (or, with respect to Revalued Property, its initial Carrying Value) as the Tax Depreciation for such year bears to its beginning adjusted tax basis.

"**Proportionate Share**" means that portion of the Interests offered for sale pursuant to Section 5.3 having the same ratio as the Interests owned by each of the Nonselling Members bears to the total number of Interests owned by all Interest Holders (other than the Interests being offered for sale).  If any Interests offered for sale pursuant to Section 5.3 are not purchased by the Member first entitled to purchase, then with respect to Members who desire to purchase such Interests, the term "**Proportionate Share**" shall include that portion of the Interests not purchased by the Member first entitled to purchase equal to the percentage that such purchasing Member's Interests bears to all Interests owned by Members who elect to make such additional purchases.

"**Representative**" means the legally appointed guardian of a mentally incapacitated Interest Holder or the legally appointed and qualified executor or personal representative of the estate of a deceased Interest Holder.  In the event no such guardian, executor or personal representative is appointed, then the Representative shall mean the spouse of such incapacitated or deceased Interest Holder, or if such Interest Holder does not have a spouse or the spouse is unable or unwilling to act, such Interest Holder's then living lineal descendants who are willing and capable of acting, one at a time in descending order of age but in no event younger than 21

years of age, or if none, such Interest Holder's then-living lineal ancestors who are willing and capable of acting, one at a time and in descending order of age.

**"Required Interest"** means one or more Members entitled to vote whose aggregate Interests are at least equal to fifty-one percent (51%) of all Interests which are entitled to vote.

**"Revalued Property"** shall mean any Property the Carrying Value of which has been adjusted in accordance with Section 3.7(a) or (b).

**"Sharing Ratio"** means the percentage that is set forth on <u>Schedule A</u>. At all times, the sum of the Sharing Ratios of all Interest Holders shall equal one hundred percent (100%)

**"Transfer"** means, with respect to an Interest, a sale, exchange, assignment, gift, pledge, grant of security interest, or any other disposition by a Member, whether voluntary, involuntary or by operation of law.

**"Treasury Regulations," "Treas. Reg."** or **"Reg."** means the temporary, proposed and final income tax regulations promulgated under the Code as amended from time to time (including corresponding provisions of succeeding regulations).

**"Unrealized Gain"** attributable to any item of Company Property means, as of any date of determination, the excess, if any, of (a) the fair market value of such Property (as determined under Section 3.7 hereof) as of such date, over (b) the Carrying Value of such Property as of such date (prior to any adjustment to be made pursuant to Section 3.7 as of such date).

**"Unrealized Loss"** attributable to any item of Company Property means, as of any date of determination, the excess, if any, of (a) the Carrying Value of such Property as of such date (prior to any adjustment to be made pursuant to Section 3.7 as of such date), over (b) the fair market value of such Property (as determined under Section 3.7) as of such date.